UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ANTHONY L. BROWN,                    )
                                     )
          Plaintiff                  )
                                     )
          v.                         )  CASE NO: 2:11-cv-00225
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
          Defendant                  )


OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Anthony L. Brown, on June 27, 2011.  For the reasons set forth below, the decision of the Commissioner is **REMANDED.**

Background

The claimant, Anthony L. Brown, applied for Disability Insurance Benefits on January 15, 2008, alleging a disability onset date of October 15, 2007.  His claim initially was denied on April 23, 2008, and again denied upon reconsideration on June 23, 2008.  (Tr. 64)  On July 7, 2008, Brown timely requested a hearing before an Administrative Law Judge.  (Tr. 101)  A hearing before ALJ Jose Anglada was held on October 22, 2009, at which Brown and vocational expert Glee Ann L. Kehr testified.  (Tr. 1)

On February 9, 2010, the ALJ issued his decision denying benefits. (Tr. 61-73)  The ALJ found that Brown had not been under a disability as defined by the Social Security Act and that Brown retained the functional capacity to perform a range of light work in a significant number of jobs in the national economy. (Tr. 70, 72)  Following a denial of Brown's request for review by the Appeals Council, he filed his complaint with this court on June 27, 2011.

Brown was born on October 29, 1962, making him 46 years old at the date of the hearing. (Tr. 5) He stands 5'9" and weighs approximately 240 pounds. (Tr. 162)  Brown is divorced and has a dependent child. (Tr. 142)  Brown has a high school education and completed one year of college. (Tr. 170)  Brown's past relevant work includes being a forklift operator, construction laborer, and truck driver. (Tr. 164)  Brown has not performed substantial gainful activity since October 15, 2007, his alleged disability onset date, through December 31, 2011, his date last insured for the purposes of Disability Insurance Benefits. (Tr. 70)  Brown stopped working as a truck driver in October 2007 because he had a serious case of gout. (Tr. 7)

Brown was diagnosed with gout, congestive heart failure, diabetes, and keratoconus. (Tr. 9, 15, 23)  Brown saw Dr. Khalida Qalbani on March 26, 2007 for his gout pain. (Tr. 221)

2

Dr. Qalbani's examination revealed that Brown's right foot was swollen and tender and that his left calf was swollen. (Tr. 222) Dr. Qalbani prescribed medication to control his gout and told Brown that he could not operate heavy machinery while taking the medication. (Tr. 222) On April 21, 2007, Brown saw an unidentified physician who noted that both his ankle and knee were swollen. (Tr. 251) On May 3, 2007, Brown went to the emergency room due to injuries sustained to his left forearm and hand when he fell off the last step coming out of his truck. (Tr. 233) The treating physician performed additional tests on Brown and diagnosed him with hypertension and a wrist sprain. (Tr. 241, 243)

Brown visited the unidentified physician again on May 29, 2007, as well as on September 26, 2007, complaining of a swollen right knee and severe knee pain. (Tr. 251, 254) Brown stated that his ankles and knees would swell when he would sit or drive, making these tasks difficult. (Tr. 254) Brown again saw the physician on October 10, 2007, with a swollen right leg and complained he was in pain. (Tr. 256) On October 30, 2007, Brown had bilateral leg edema, a swollen left leg, persistent left knee and ankle pain, a swollen left wrist, and a swollen right knee. (Tr. 257) Brown was prescribed Vicodin to manage his pain. (Tr. 257)

On March 19, 2008, Brown was referred to Dr. Richard Longley for a consultation to aid with the management of his diabetes. (Tr. 288)  Dr. Longley found that Brown had very high blood glucose, greater than 500 mg, and noted his treatment for congestive heart failure, which may have been secondary to myocardial infarction. (Tr. 288)  Dr. Longley recommended that Brown continue on IV fluids, an IV insulin drop, and IV antibiotics.  (Tr. 290)

On March 22, 2008, Brown saw Dr. Harish Shah who drafted a consultative report. In the report he determined that Brown suffered from asthma, hypertension, diabetes, and congestive heart failure, and he also noted that Brown's electrocardiogram was abnormal.  (Tr. 291)  An echocardiogram conducted on the same day revealed that both the left and right ventricles were moderately dilated, a mild concentric left ventricular hypertrophy, reduced left ventricular function, and an ejection fraction of 45-50%.  (Tr. 304-305)

On April 16, 2008, Brown underwent a consultative examination performed by a Disabilities Determination Services selected physician, Dr. B. Sheikh.  (Tr. 314-317)  Dr. Sheikh noted Brown's limp due to left knee pain as well as Brown's inability to stoop or squat.  (Tr. 317)  Dr. Sheikh also stated that Brown had been diagnosed with arthritis in his knees, ankles, wrist,

and big toes; gout in his right big toe, left knee, left ankle, and left wrist; and insulin-dependent diabetes.  (Tr. 314)  Brown was documented as taking Metformin (500mg), Allopurinol (100mg), and Clonodine (.2mg).  (Tr. 314)  Dr. Sheikh provided the following impressions: rule out degenerative joint disease in left knee, left knee pain with restricted range of motion; and arthritis, gout, hypertension, and diabetes mellitus type II.  (Tr. 317)

On May 16, 2008, a non-examining State Agency reviewing physician, Dr. M. Brill, completed a Physical Residual Functional Capacity Assessment.  (Tr. 319-326)  Dr. Brill determined that Brown was capable of light work with occasional limitations when climbing ramps and stairs, ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling, and frequent postural limitations when balancing.  (Tr. 321)  Brown was found to have no manipulative, visual, or communicative impairments.  (Tr. 322)  Dr. Brill also recommended that Brown avoid concentrated exposure to wet or slippery surfaces.  (Tr. 323)  Dr. Brill concluded that Brown's "medically determinable impairments could reasonably be expected to produce the alleged symptoms but the intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence."  (Tr. 324)  On June 23, 2008, Dr.

Brill's decision was affirmed by a second State Agency reviewing physician, Dr. Mangala Hasanakada.  (Tr. 327)

A Medical Assessment of Brown's Ability to Do Work-Related Activities (Physical) was completed on November 21, 2008, by Nurse Nicole Richards.  (Tr. 329-331)  The assessment indicated that Brown could carry and lift less than 20 pounds for up to 1/3 of an eight hour workday, with that also being the maximum amount he could carry in an eight hour workday.  (Tr. 329)  It also was determined that Brown could stand and walk for only two hours out of an eight hour workday and could do so for only one hour without interruption.  (Tr. 329)  Brown could sit for only four hours in total during an eight hour workday, and could sit for only two hours without interruption.  (Tr. 330)  The assessment also concluded that Brown should never stoop, crouch, kneel, or crawl, and that he could climb or balance for only 1/3 of an eight hour workday. (Tr. 330)  Further, the assessment stated that Brown's vision problems were a result of his keratoconus. (Tr. 330)  The assessment also indicated that Brown would require a period of rest of up to two hours throughout an eight hour workday for one hour at a time in a reclining position with his legs elevated above his heart. (Tr. 331)  Brown also was given a cane to ambulate.  (Tr. 331)

On March 26, 2009, Dr. Hakam Safadi conducted a sleep study on Brown. (Tr. 344)  Dr. Safadi concluded from the results that Brown suffered from cardiac arrhythmia, Cheyne-Stoke respirations, and a mild periodic limb movement disorder.  It was recommended that Brown be treated with a BiPAP machine, that he lose weight, and that he be cautioned about taking CNS depressants at bedtime.  (Tr. 344)

On July 5, 2009, Brown's Troponin levels were measured by having blood drawn.  (Tr. 365, 394)  Troponin levels below .05 NG/ML are within normal range and are considered high if they are above .05 NG/ML.  Brown's Troponin level was .105 NG/ML.  (Tr. 398)  Brown was diagnosed with a mildly enlarged heart.  (Tr. 398)  On July 6, 2009, Brown was admitted to the hospital for chest pain radiating towards the left arm and left side of the face.  (Tr. 414)  Brown also had numbness towards his lower extremities, which began after he had been sitting and working on the computer for about 1 hour.  (Tr. 414)  An echocardiogram revealed a mild concentric left ventricular hypertrophy with an ejection fraction of 20-25%, a severely dilated left ventricle, a moderately dilated right ventricle, a severely dilated left atrium, and moderate to severe mitral regurgitation.  (Tr. 365-66, 398)  It was noted that Brown suffered from minimal coronary artery disease with severe cardiomyopathy, dilated cardiomyopathy

with severe hypokinesis, and acute nontransmural myocardial infarction with no significant coronary stenosis suggestive of coronary spasms. (Tr. 408) On July 7, 2009, during a consulta- tive examination discussing the implantation of an Implantable Cardioverter Defibrillator, Dr. Mark Mitchell notified Brown that he no longer would be able to operate a truck. (Tr. 409-10) Brown also was informed that due to his condition there was a risk of sudden cardiac arrest. (Tr. 410) Brown's diagnoses also were reviewed by Dr. Scott Kaufman on September 9, 2009. (Tr. 401) Dr. Kaufman stated that Brown had nonsustained ventricular tachycardia, ischemic dilated cardiomyopathy, atrial fibrilla- tion, and a reduced ejection fraction. (Tr. 402)

Brown underwent a colonoscopy and gastroscopy on August 25, 2009, after which he felt ill and began to experience chest and abdominal pain. He was admitted to the hospital on August 31, 2009. (Tr. 510) An electrocardiogram revealed atrial fibrilla- tion at a controlled ventricular response rate, poor right wave progression, and infralateral repolarization abnormality compati- ble with a strain. (Tr. 519)

On March 10, 2010, Brown's right lower leg had soft tissue swelling with suggestion of subcutaneous edema of the lower leg and ankle region due to a fall down the stairs. (Tr. 608) An arterial doppler examination was limited due to calcified arter-

ies.  (Tr. 609)  A second physician reviewed Brown's injury from his fall and concluded that Brown had cellulitis at the site of the injury and an infected wound.  (Tr. 629)

At the hearing before the ALJ, Brown testified that he quit working on October 15, 2007, because he had a bad case of gout in both legs and ankles and was unable to walk for a two week period.  (Tr. 9-10)  Before this case of gout in October, Brown previously had experienced only one episode of gout isolated to his big toe.  (Tr. 9-10)  After the initial October episode, Brown continued to have gout flare ups despite taking gout medication. (Tr. 11)  Brown stated that the flare ups typically lasted four consecutive days, and during the flare up, he was confined either to his bed or to his recliner because of the pain caused by walking.  (Tr. 14)  Brown would leave his house only to go to necessary appointments such as doctor visits.  (Tr. 14) Brown also said that during a flare up he was unable to sleep at night with any covers because the weight of the covers caused him extreme pain.  (Tr. 14)  Brown also testified that his feet would swell daily.  (Tr. 10) Sitting down for long periods, about one or two hours, would cause his feet to swell.  (Tr. 25)  Brown also stated that he could walk or stand in place for only five minutes.  (Tr. 25)

9

Brown also testified that he had congestive heart failure, which prevented him from working.  (Tr. 15)  Brown had a heart attack two months prior to the hearing with the ALJ and also had an arrhythmia.  (Tr. 15)  Brown was unable to feel the effects of the arrhythmia.  (Tr. 19) Brown was given a blood thinner, Coumadin, for his condition and had to have his blood drawn weekly. (Tr. 16)  Brown testified that his condition left his heart weak and enlarged, causing it to overwork itself.  (Tr. 17)  Brown stated that because of his condition, he was unable to walk up more than four steps before becoming fatigued, thus preventing him from working.  (Tr. 21)

Brown also was insulin dependent, taking 15 units of Novalong 3 times a day with a meal as well as 30 units of Lantis once before bed.  (Tr. 23)  Brown testified that he also had vision problems that might be caused by his diabetes but that he was unsure because he also suffered from keratoconus.  (Tr. 23) Brown could not wear glasses due to the keratoconus and could read only at a close distance for a short period of time because reading caused him to become dizzy and to get headaches.  (Tr. 24)  Lastly, Brown testified that he tried to follow the doctors' guidelines in terms of a diet but that he received food stamps and was unable to afford the proper nutrition.  (Tr. 36-37)

Vocational Expert Glee Ann Kehr also testified, identifying Brown's past relevant work as a truck driver and a forklift operator.  (Tr. 39)  The ALJ posed a hypothetical question concerning an individual with Brown's age, education, and work experience who was limited to lifting and carrying no more than 20 pounds occasionally, needed to alternate between sitting and standing, occasionally could bend, kneel or crouch, should not be exposed to working on heights or climbing ladders, and occasionally could negotiate stairs.  (Tr. 40)  The VE testified that Brown could not perform his past work under this hypothetical, but other work existed such as "rental clerk", "office helper", and "information clerk".  (Tr. 41)  All of these positions had a specific vocational preparation of 2, indicating unskilled work. (Tr. 40-41)

The ALJ added to the hypothetical that the individual needed to elevate his legs three times a month for two hours at a time. The VE testified that if the legs were elevated below seat height it would be allowable, but if the legs needed to be elevated above seat height it would not be allowable.  (Tr. 41)  The last hypothetical asked by the ALJ was if the individual's impairments affected his consistence and pace 20% of the time, would work be precluded.  The VE testified that this hypothetical would precluded competitive employment.  (Tr. 42)

11

The VE was asked to look at Brown's RFC assessment, which was completed by Nurse Richards.  The VE testified that if Brown would need to rest in a reclining position for more than two hours during an eight hour work day, he would be precluded from work.  (Tr. 43)  Also, the VE testified that if an individual had to miss work because of gout more than one time per month, work would be precluded.  (Tr. 44)

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled.  (Tr. 65-66)  In step one, the ALJ found that Brown had not engaged in substantial gainful activity since October 15, 2007, his alleged onset date, through the date he was last insured.  (Tr. 66)  At step two, the ALJ found that Brown had the following severe impairments: hypertensive vascular disease, diabetes, gout, and arthritis.  (Tr. 66)  At step three, the ALJ found that Brown did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 69)  In particular, Brown's impairments did not meet or medically equal Sections 9.09 (diabetes mellitus), 4.03 (hypotensive cardiovascular disease), or 14.09 (arthritis).  (Tr. 70)

In determining Brown's RFC, the ALJ stated that he carefully considered the entire record and found that Brown was limited to

12

lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently and needed to be able to alternate between sitting and standing. The ALJ found that Brown could occasionally climb stairs, bend, kneel, and crouch, but that he was unable to work at heights or climb ladders.  (Tr. 70)

In reaching this determination, the ALJ considered Brown's testimony, noting that Brown had gout flare ups once a month that lasted for four days, had heart failure and took Coumadin, used a CPAP mask that was prescribed four months prior, could lift and carry 20 pounds occasionally, could walk for five minutes and stand for five minutes, could sit for only one-two hours, could bend occasionally, was unable to kneel, must elevate his legs routinely during the day for leg swelling, and had side effects from his medication including dizziness and tiredness.  (Tr. 70)

The ALJ went on to state that based on "careful consider-ation of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsis-tent with the above residual functional capacity assessment." (Tr. 70)  The ALJ also stated that Brown's allegations of pain and resulting limitations were not supported by the medical

13

evidence.  (Tr. 71)  The ALJ explained that Brown's diabetes and
hypertension were controlled when he followed prescribed treat-
ment but that Brown admitted to non-compliance with prescribed
treatment in regards to his medication.  (Tr. 71)  The ALJ noted
that Brown's hypotensive vascular disease and non-ischemic
cardiomegaly were secondary to his hypertension and diabetes.
The ALJ also stated that Brown told his doctor he had not fol-
lowed his diet and that the medical evidence of record did not
support the frequency of alleged gout flare ups nor the need for
elevation of his legs to the extent testified to by Brown.  The
ALJ noted that Brown's physical examinations had been unremark-
able and that he had full range of motion in the cervical,
lumbar, and thoracic spines.  (Tr. 71)  The ALJ explained that
"after a thorough review of the medical evidence of record, the
undersigned finds the claimant retains the residual functional
capacity to perform a wide range of light work."  (Tr. 71) The
ALJ concluded by disclosing that he gave little weight to the
opinion of Nicole Richards' RFC assessment because it was not
supported by the evidence of record.  Instead, the ALJ gave
significant weight to the non-examining state agency medical
consultant's opinion, stating that this opinion was supported by
the record as a whole.  (Tr. 71)

14

At step four, the ALJ found that Brown did not possess the residual functional capacity to perform any past relevant work. (Tr. 71)  At step five, the ALJ considered Brown's age, education, work experience, and RFC, and concluded that jobs existed in significant numbers in the national economy that Brown could perform.  (Tr. 72)  These jobs included a rental clerk (2,700 jobs), an office helper (1,400 jobs), and an information clerk (5,400 jobs).  Such jobs were available at light exertional levels with sit/stand options and were unskilled.  (Tr. 72)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  *Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See*

15

*also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003); **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  **Rice v. Barnhart**, 384 F.3d 363, 368-69 (7th Cir. 2004); **Scott v. Barnhart**, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  **Lopez**, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the

ALJ next addresses whether the claimant has a severe impairment
or combination of impairments which "significantly limits . . .
physical or mental ability to do basic work activities."  20
C.F.R. §404.1520(c).  Third, the ALJ determines whether that
severe impairment meets any of the impairments listed in the
regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it
does, then the impairment is acknowledged by the Commissioner to
be conclusively disabling.  However, if the impairment does not
so limit the claimant's remaining capabilities, the ALJ reviews
the claimant's residual functional capacity and the physical and
mental demands of his past work.  If, at this fourth step, the
claimant can perform his past relevant work, he will be found not
disabled.  20 C.F.R. §404.1520(e).  However, if the claimant
shows that his impairment is so severe that he is unable to
engage in his past relevant work, then the burden of proof shifts
to the Commissioner to establish that the claimant, in light of
his age, education, job experience and functional capacity to
work, is capable of performing other work and that such work
exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R.
§404.1520(f).

Brown argues that the ALJ erroneously concluded that his
impairments failed to meet or equal a listing and failed to state
any explanation as to why they were not met.  A theory of "pre-

17

sumptive disability" is employed in Social Security disability cases, which means that a claimant is eligible for benefits if he has a condition that "meets or equals" an impairment designated by the Commissioner. The listing of impairments, found at 20 C.F.R. Pt. 404, subpt. P, app. 1, includes specific criteria for each designated impairment. If a claimant meets the criteria for a given impairment, the agency presumes he is disabled. *See* 20 C.F.R. §404.1520; *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). A claimant also may show disability presumptively by demonstrating that his symptoms are equal in severity to those described in a listing. *Barnett,* 381 F.3d at 668; 20 C.F.R. §404.1526.

The Seventh Circuit has held that in determining whether a claimant meets or equals a listing, an ALJ must do more than name the listing and give merely a "perfunctory analysis" of it. *Barnett*, 381 F.3d at 668. An ALJ should evaluate the evidence in light of a listing's criteria, including evidence favorable to the claimant. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). *See also Barnett*, 381 F.3d at 670 (finding ALJ's two-sentence discussion of listing inadequate and warranting remand); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (finding ALJ's failure to discuss claimant's impairments "in conjunction" with listing "frustrates any attempt

18

at judicial review"); *Scott*, 297 F.3d at 595 (finding ALJ's failure to discuss evidence in light of listing's "analytical framework" leaves court "with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (finding erroneous ALJ's failure to discuss or cite listing at step three).

If the claimant believes the ALJ's decision that he did not meet or equal a listing was incorrect, the claimant bears the burden of proof to show that his condition qualifies. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). For a claimant to meet this burden, he must demonstrate that his impairment satisfies each required criterion. *Maggard*, 167 F.3d at 380. A condition that meets only some of the required medical criteria, "no matter how severely," does not meet a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

In his opinion, the ALJ stated that he "considered the claimant's impairments in the context of the listing, however the claimant does not demonstrate the clinical signs and findings that meet or medically equal a listed impairment, most specifically Sections 9.09 (diabetes mellitus); 4.03 (hypotensive cardiovascular disease) or 14.09 (arthritis)." (Tr. 70) The ALJ provided no further explanation in this section of his opinion to

19

show why Brown failed to meet the identified Listings.  However, the Commissioner argues that the immediately preceding section sets forth specific and detailed medical information, adequately explaining why Brown did not meet the Listing requirements.  The court will consider the named Listings in turn with regard to the medical evidence set forth in the ALJ's opinion to determine if the ALJ's failure to explain his conclusion was reversible or harmless error.

To begin, the ALJ stated that he considered the evidence in light of Listing 4.03 (hypotensive cardiovascular disease) but that Brown's impairments fell short of those requirements.  However, Listing 4.03 was removed in January 2006, before Brown even filed his initial application for disability benefits. *See* Revised Medical Criteria for Evaluating Cardiovascular Impairments, 71 Fed. Reg. 9, 2318 (January 13, 2006).  Therefore, remand on this issue is unnecessary because Brown no longer would be presumptively disabled if he met this Listing.

Next, the ALJ concluded that Brown did not meet the Listing requirements for 9.09 (diabetes mellitus), but he failed to provide any discussion about the criteria for this Listing.  However, Listing 9.09 addressed obesity and was removed from the Listings in October 1999. ***Sorenson v. Barnhart***, 2002 WL 1917031, *8 (N.D. Ill. Aug. 20, 2002).  The court assumes that the ALJ

20

intended to state that Brown did not meet Listing 9.08 for
diabetes mellitus.  Listing 9.08 has since been deleted, although
the Social Security Administration still considers diabetes
mellitus as a presumed impairment if the symptoms are not con-
trolled and are accompanied by additional complications.  The
diabetes mellitus Listing in effect at the time of the ALJ's
decision stated that an individual was presumptively disabled if
he had diabetes mellitus with:

> A.   Neuropathy demonstrated by significant
>      and persistent disorganization of motor
>      function in two extremities resulting in
>      sustained disturbance of gross and dex-
>      terous movements, or gait and station
>      (see 11.00C); or
>
> B.   Acidosis occurring at least on the aver-
>      age of once every 2 months documented by
>      appropriate blood chemical tests (pH or
>      pCO2 or bicarbonate levels); or
>
> C.   Retinitis proliferans; evaluate the
>      visual impairment under the criteria in
>      2.02, 2.03, or 2.04.

20 C.F.R. Pt. 404, subpt. P, app. 1, 9.08.

Brown is correct that the ALJ did not minimally articulate
the reasons why he did not meet Listing 9.08.  The ALJ provided
absolutely no discussion of why Brown's condition fell short of
meeting the Listing requirements.  However, it is equally unclear
that there is any basis on which Brown may have satisfied the
Listing.  The record does not reflect that Brown had significant

neuropathy, acidosis once every two months, or retinitis prolifer-
ans, nor does Brown contend that he experienced any of these
conditions.  The court will not remand a decision for further
explanation when remand would not result in a different outcome.

Finally, Brown argues both that the ALJ failed to articulate
his reason for finding that Brown did not meet Listing 14.09 and
that the ALJ was incorrect in this determination. Listing 14.09
describes inflammatory arthritis "as described in 14.00D6," which
states, "clinically, inflammation of major peripheral joints may
be the dominant manifestation causing difficulties with ambula-
tion or fine and gross movements; there may be joint pain,
swelling, and tenderness. The arthritis may affect other joints,
or cause less limitation in ambulation or the performance of fine
and gross movements."  Brown argues that he specifically met
section (A)(1), which states:

> Persistent inflammation or persistent defor-
> mity of: One or more major peripheral weight-
> bearing joints resulting in the inability to
> ambulate effectively (as defined in
> 14.00(C)(6);

14.00(C)(6) explains that the inability to ambulate effectively
has the same meaning as in 1.00(B)(2)(b), which provides:

> b.   What We Mean by Inability to Ambulate
>      Effectively
>
>      (1) Definition.  Inability to ambu-
>      late effectively means an extreme
>      limitation of the ability to walk;

22

i.e., an impairment(s) that inter-
feres very seriously with the indi-
vidual's ability to independently
initiate, sustain, or complete
activities.  Ineffective ambulation
is defined generally as having
insufficient lower extremity func-
tioning (see 1.00J) to permit inde-
pendent ambulation without the use
of a hand-held assistive device(s)
that limits the functioning of both
upper extremities.

(2) To ambulate effectively, indi-
viduals must be capable of sustain-
ing a reasonable walking pace over
a sufficient distance to be able to
carry out activities of daily liv-
ing.  They must have the ability to
travel without companion assistance
to and from a place of employment
or school.  Therefore, examples of
ineffective ambulation include, but
are not limited to, the inability
to walk without the use of a walk-
er, two crutches or two canes, the
inability to walk a block at a
reasonable pace on rough or uneven
surfaces, the inability to use
standard public transportation, the
inability to carry out routine
ambulatory activities, such as
shopping and banking, and the in-
ability to climb a few steps at a
reasonable pace with the use of a
single hand rail.  The ability to
walk independently about one's home
without the use of assistive de-
vices does not, in and of itself,
constitute effective ambulation.

Brown argues he was unable to ambulate effectively because
he used a cane and because his condition caused significant
swelling which interfered with his ability to perform routine

23

ambulatory activities.  Even if Brown did require the use of a single cane, he did not meet the requirements of the Listing. The relevant section of the Listing states, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that *limits the functioning of both upper extremities*." (emphasis added). *See also **Coleman v. Astrue***, 269 Fed. Appx. 596, 602 (7th Cir. 2008) (noting that qualifying under the relevant subpart of the Listing requires the use of a walker, two crutches or two canes).  Use of a single cane only limits the functioning of one upper extremity, thereby disqualifying Brown from equaling the Listing.

Furthermore, the record shows that Brown was able to travel unaccompanied to and from his doctor visits and that he did not require the use of an assistive device to ambulate, as observed on April 16, 2008, by Dr. Sheikh.  Also, no physician stated that Brown required the use of a cane, and Nurse Richards' opinion failed to provide any medical findings that supported her opinion that Brown required one.  Because "the applicant must satisfy all of the criteria in the Listing in order to receive an award of disability insurance benefits," ***Rice***, 384 F.3d at 369  and the record is devoid of any evidence demonstrating that Brown's use

24

of both upper extremities was restricted, the ALJ's conclusion that Brown did not qualify for Listing 14.09 is affirmed.

Brown next argues that the ALJ erred by not including Listing 4.04(c) in his opinion.  Brown contends that he may have met Listing 4.04(c) because his treatment notes indicated calcification and restriction of his arteries.  The Listing is as follows:

> 4.04 (c):  Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:
>
> 1.   Angiographic evidence showing:
>
> a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or
>
> b. 70 percent or more narrowing of another nonbypassed coronary artery; or
>
> c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
>
> d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or

              e. 70 percent or more narrowing of
              a bypass graft vessel; and

      2.    Resulting in very serious limitations in
           the ability to independently initiate,
           sustain, or complete activities of daily
           living.

Although Brown's treatment notes showed that he had some calcification and restriction of the arteries, nowhere in the record was there evidence that suggested Brown would meet the qualifications of Listing 4.04(c)(1)(a)-(e).  Because Brown had the burden to show that his condition satisfied the requirements set forth in the Listing, and he has not pointed to any evidence to support his condition, Brown failed to satisfy his burden to show that remand is warranted on this issue.

Brown also contends that the ALJ erred by not requesting the presence of a medical expert at the hearing. Brown argues that SSR 96-6p requires the ALJ to consider expert testimony "before a decision of disability based on medical equivalence can be made." Although this is true, SSR 96-6 also notes that "the signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician . . . designated by the Commis-sioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." SSR 96-6p goes on to state that "when an administrative law judge

26

or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant."  The signature of a physician on a Disability Determination and Transmittal form "conclusively establishes" that a medical consultant designated by the Commissioner has considered the question of medical equivalence. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

Here, both Dr. Brill and Dr. Hasanadka completed Disability Determination and Transmittal forms, indicating that Brown did not equal any Listing.  Therefore, the record reflects that a physician designated by the Commissioner reviewed the medical evidence.  Because of this, the ALJ did not err by failing to require the presence of a medical expert at the hearing.

Next, Brown argues the ALJ made an erroneous, boilerplate credibility determination.  This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.  *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.").  The ALJ's

"unique position to observe a witness" entitles his opinion to great deference. ***Nelson v. Apfel,*** 131 F.3d 1228, 1237 (7th Cir. 1997); ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. ***Steele,*** 290 F.3d at 942. Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §404.1529(a); ***Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir. 2007) ("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); ***Scheck***, 357 F.3d at 703.  If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical

28

signs and laboratory findings, and statements from [the claimant,
the claimant's] treating or examining physician or psychologist,
or other persons about how [the claimant's] symptoms affect [the
claimant]." 20 C.F.R. §404.1529(c); **Schmidt**, 395 F.3d at 746-47
("These regulations and cases, taken together, require an ALJ to
articulate specific reasons for discounting a claimant's testi-
mony as being less than credible, and preclude an ALJ from merely
ignoring the testimony or relying solely on a conflict between
the objective medical evidence and the claimant's testimony as a
basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally
unsupported by the medical evidence, the ALJ may not make a
credibility determination "solely on the basis of objective
medical evidence." SSR 96-7p at *1.  See also **Indoranto v.
Barnhart**, 374 F.3d 470, 474 (7th Cir. 2004); **Carradine v. Barn-
hart**, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling,
the fact that its source is purely psychological does not disen-
title the applicant to benefits."). Rather,

> if the claimant indicates that pain is a
> significant factor of his or her alleged
> inability to work, the ALJ must obtain de-
> tailed descriptions of the claimant's daily
> activities by directing specific inquiries
> about the pain and its effects to the claim-
> ant. She must investigate all avenues pre-
> sented that relate to pain, including claim-
> ant's prior work record, information and
> observations by treating physicians, examin-

ing physicians, and third parties. Factors
that must be considered include the nature
and intensity of the claimant's pain, precip-
itation and aggravating factors, dosage and
effectiveness of any pain medications, other
treatment for relief of pain, functional
restrictions, and the claimant's daily activ-
ities. (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
1994).

*See also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir.
2001).

In addition, when the ALJ discounts the claimant's descrip-
tion of pain because it is inconsistent with the objective
medical evidence, he must make more than "a single, conclusory
statement . . . .  The determination or decision must contain
specific reasons for the finding on credibility, supported by the
evidence in the case record, and must be sufficiently specific to
make clear to the individual and to any subsequent reviewers the
weight the adjudicator gave to the individual's statements and
the reasons for that weight."  SSR 96-7p at *2.  *See Zurawski*,
245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir.
1995) (finding that the ALJ must articulate, at some minimum
level, his analysis of the evidence).  He must "build an accurate
and logical bridge from the evidence to [his] conclusion."
*Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872).
When the evidence conflicts regarding the extent of the claim-

30

ant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See* *Zurawski*, 245 F.3d at 888 (*quoting* *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

A claimant may be denied benefits based on his failure to follow prescribed treatments depending on whether that treatment would have eliminated the disability and whether he had a sufficient excuse. 20 C.F.R. §404.1530(a); *Luna*, 22 F.3d at 691.  Many circuits have upheld the inability to afford medications or regular doctors visits as a valid excuse for failing to follow a prescribed course of treatment.  *See* *Buchholtz v. Barnhart*, 98 Fed. Appx. 540, 546-47 (7th Cir. 2004) (*citing* SR 96-7p at 8; *Newell v. Comm'r of Soc. Security*, 347 F.3d 541, 547 (3rd Cir. 2003); *Shaw v. Chater*, 221 F.3d 126, 133 (2nd Cir. 2000); *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)).  However, an "absence of evidence that a claimant sought low-cost or free care may warrant discrediting his excuse that he could not afford treatment." *Buchholtz*, 98 Fed. Appx. at 546 (*citing* *Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003)).

The ALJ states in his opinion, "after careful consideration of the evidence, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 70) Brown argues that the ALJ impermissibly evaluated Brown's credibility by simply reciting a boilerplate statement without providing any explanation as to why Brown's statements and testimony were not credible.

After making this boilerplate statement, the ALJ went on to state that Brown's allegations of pain and limitations were not supported by the medical evidence.  His diabetes and hypertension were controlled when he followed the prescribed treatment.  Brown admitted that he did not follow his treatment plan, including failing to follow the suggested diet to reduce gout flare ups. The ALJ also noted that the medical evidence did not support the frequency of the flare ups or the need for elevation of his legs. Brown's medical examinations essentially were unremarkable and displayed that he had a full range of motion in the cervical, lumbar, and thoracic spines.

32

The ALJ did more than provide a boilerplate statement explaining his credibility finding.  He went on to point to specific inconsistencies, lack of corroborating evidence, and Brown's failure to follow his treatment plan, which suggested that his symptoms would be reduced if he complied. The ALJ was permitted to rely on the lack of corroborating evidence, and he supported his conclusions by noting that none of Brown's examinations reported marked limitations or a decreased range of motion.

However, the ALJ's credibility determination appears to center around Brown's lack of treatment and failure to follow the suggested diet.  Although a claimant's failure to follow a treatment plan can affect credibility when a claimant "does not have a good reason for the failure . . . of treatment," before the ALJ may draw inferences about the claimant's condition from a failure to comply, the ALJ first must determine the reasons for non-compliance.  ***Craft v. Astrue***, 539 F.3d 668, 679 (7th Cir. 2008)(failure to comply due to inability to pay for treatment, for example, may be an acceptable reason for non-compliance). The record does not reflect that the ALJ questioned Brown as to why he was unable to comply with treatment or the proposed dietary restrictions.  Brown indicated that he was on food stamps, drawing into question whether his financial condition hampered his ability to receive treatment and follow the recommended diet.

33

On remand, the ALJ is DIRECTED to illicit a reason for Brown's failure to comply and to provide a more thorough explanation for his credibility determination.

Next, Brown contends that the ALJ failed to consider the medical opinions of the treating physicians and nurse appropriately. Brown argues that the ALJ improperly relied on the State Agency opinions without giving proper explanation as to why he disregarded the treating physician's evidence. A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "consistent with substantial evidence in the record." 20 C.F.R. §404.1527(d)(2). *See also* ***Schmidt***, 496 F.3d at 842; ***Skarbek v. Barnhart***, 390 F.3d 500, 503 (7th Cir. 2004). The treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of time, but it also may be unreliable if the doctor is sympathetic with the patient and thus "too quickly find[s] disability." ***Stephens v. Heckler***, 766 F.2d 284, 289 (7th Cir. 1985). *See also* ***Schmidt***, 496 F.3d at 842. Accordingly, if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it.

34

*See* ***White v. Barnhart***, 415 F.3d 654, 659 (7th Cir. 2005); ***Skar-bek***, 390 F.3d at 503.

Brown believes that SSR 06-03p requires that the ALJ give Nurse Richards' opinion the same weight as a treating physician's opinion is given under 20 C.F.R. §404.1527.  However, Nurse Richards was not an "acceptable medical source" and does not fall under the same standard. 20 C.F.R. §§404.1502; 404.1513(d)(1), (3); SSR 06-03p, 2006 WL 2329939 at *2-4.  SSR 06-03p states "opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects."  However, the ruling says nothing about giving controlling weight to such sources.  The ruling does say that the evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case and each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case. SSR 06-03p, 2006 WL 2329939 at *5.  The ALJ noted Richards' findings in great detail in his opinion, showing that he considered her opinion and did not ignore it.

Even if Nurse Richards' opinion was entitled to the same standard of a treating physician's opinion, her opinion was not

supported by substantial evidence in the record.  Richards opined
that Brown's back pain limited the weight he could lift and the
amount of time he could sit and stand.  However, as noted by the
ALJ, Dr. Sheikh stated that Brown retained full range of motion
in the lumbar, cervical, and thoracic region. The record also
provided numerous notes, which the ALJ mentioned, where Brown's
physical examinations were considered to be "unremarkable."  In
Richards' assessment of Brown, Sections I, II, III, IV, and VII
failed to elaborate the medical findings upon which the assess-
ment was based, and Section IX failed to explain why Brown re-
quired a cane.  In contrast, the State Agency Consultant's
opinion was well supported by the evidence.  The State Agency's
opinion noted Brown's antalgic gait, left knee pain, inability to
stoop or squat, blood pressure, uric acid levels, left hand x-
rays, and mild hypertrophy. The ALJ did not err in weighing the
evidence of record.

Brown also contends that the ALJ erred by not requesting an
RFC finding from the consultative examiner, Dr. Sheikh.  However,
a claimant's RFC is determined by the ALJ, and not by physicians
such as Dr. Sheikh.  *Diaz*, 55 F.3d at 306 n.2.  In addition, 20
C.F.R. §404.1519n(c)(6) states, "[a]lthough we will ordinarily
request, as part of the consultative examination process, a
medical source statement about what you can still do despite your

36

impairment(s), the absence of such a statement in a consultative examination report will not make the report incomplete."  Therefore, the ALJ did not commit reversible error by failing to request an RFC finding from Dr. Sheikh.

Brown next argues the ALJ failed to present the VE with hypotheticals that included all relevant limitations from which he suffered and that the ALJ failed to follow SSR 00-4p at Step Five.  The Commissioner has the burden to establish at Step Five that given the claimant's condition, the claimant could perform substantial gainful work existing in the national economy. *Steward v. Bowen*, 858 F.2d 1295, 1297 n.2 (7th Cir. 1988).  Hypotheticals posed by an ALJ to a VE only need to include limitations and abilities to the extent that they are supported by the record.  *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994). Brown argues that the ALJ should have included in his hypothetical the need to elevate his legs above chair level after a half hour to an hour of activity and the need to recline for up to two hours per day.  Also missing from the hypothetical, Brown argues, was his inability to walk a few steps without having to stop and rest.

An ALJ is "required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible."  *Schmidt*, 496 F.3d at 846.  When a hypothetical

37

question accurately identifies the limitations credibly supported
by the record and included in the RFC finding, the VE's response
to that question is substantial evidence in support of the ALJ's
decision.  *Schmidt*, 496 F.3d at 846.  Here, the ALJ's credibility
determination, as mentioned above, is insufficient and requires
the case to be remanded.  Because the ALJ need only ask the VE
hypothetical questions addressing the evidence that he finds
credible, if the ALJ finds that Brown was not credible after
considering the evidence of record as directed by the court, then
the ALJ does not need to re-evaluate this issue.  However, if he
finds Brown's statements regarding his need to elevate his legs,
recline, and inability to walk to be credible, on remand the ALJ
must pose these questions to a vocational expert.

Brown further argues that the ALJ's sit/stand option is
insufficient because it does not specify the length of time or
frequency of the claimant's need to alternate between different
positions and does not allow for a determination of the claim-
ant's ability to perform a particular job.  The ALJ stated twice
while questioning the VE that Brown needed to alternate between
sitting and standing.  The VE also mentioned Brown's need for a
sit/stand option when she was determining what jobs Brown could
perform.  (Tr. 41) Courts have held that the use of the word
option implies that a claimant may sit or stand as needed and at

38

will.  *See Schmidt*, 496 F.3d at 844 ("Schmidt argues that the ALJ's analysis was deficient because he did not specify the frequency with which she would need to alternate between sitting and standing. We find Schmidt's contention unavailing, however, because the ALJ did restrict Schmidt to work that allowed her an opportunity to sit or stand at her 'own option.'").  The record shows that the ALJ included a sit/stand option in his hypothetical and that the VE included a sit/stand option when she determined that the claimant with the hypothetical limitations could perform certain jobs. The ALJ did not err in his sit/stand hypothetical.

Brown also argues that the ALJ committed error by not inquiring whether the VE testimony was consistent with the Dictionary of Occupational Titles.  Brown argues that the sit or stand option is not included in the DOT description for the jobs identified by the VE, and therefore there was a conflict between the VE and the DOT.  SSR 00—4p, 2000 WL 1898704 at *4 (Dec. 4, 2000). "SSR 00—4p places an affirmative duty on the ALJ to resolve conflicts between the evidence the VE has provided and the Dictionary of Occupational Titles after the VE has testified. The ALJ cannot transfer his duty to the VE." *Kallio v. Astrue,* 2009 WL 500552, *9 (N.D. Ind. 2009) (citations omitted).  It is

the responsibility of the ALJ to resolve inconsistencies between the VE's testimony and the DOT. *Prochaska,* 454 F.3d at 736.

Here, the ALJ failed to ask the VE whether his testimony was consistent with the DOT. The Commissioner asserts that remand is unnecessary because there was no actual conflict and his failure to inquire was harmless error. Brown argues that there are inconsistencies between the testimony and the DOT, mainly that the ALJ found Brown to be limited to jobs with a sit/stand option, but the DOT descriptions for the jobs identified by the VE do not include a sit/stand option. The Commissioner addresses this alleged inconsistency by citing a number of cases for the proposition that "because the DOT does not address the subject of sit/stand options, it is not apparent that the testimony con-flicts with the DOT." (*citing Zblewski v. Astrue,* 2008 WL 5206384, *4 (7th Cir. Dec. 15, 2008)). However, in the cases cited by the Commissioner, the VE was asked whether his testimony was consistent with the DOT. There is a different standard when the ALJ fails to ask the VE if there is a conflict: in these situations, the plaintiff is required only to demonstrate that there was some inconsistency between his testimony and the DOT, not that the inconsistency was apparent. *McClendon v. Astrue,* 2010 WL 4537843, *10 (N.D. Ind. Oct. 28, 2010); *Prochaska,* 454 F.3d at 735—36. *See also Overman v. Astrue,* 546 F.3d 456, 463

40

(7th Cir. 2008) (analyzing **Prochaska**). For this reason, the ALJ's failure to comply with the requirements of SSR 00—4p is not harmless error and requires remand.

_____

Based on the foregoing, the ALJ's decision denying benefits is **REMANDED.**

ENTERED this 11th day of September, 2012

                         s/ ANDREW P. RODOVICH
                           United States Magistrate Judge